**DAVAR PRODUCTS, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

United States District Court
S. D. New York.

July 7, 1965.

David Scher, New York City, for plaintiff.

Robert M. Morgenthau, U. S. Atty. Southern District of New York, for defendant; Harvey R. Blau, Asst. U. S. Atty., of counsel.

LEVET, District Judge.

This is an action for refund of excise taxes in the sum of $5,699.47, plus interest, under 28 U.S.C. § 1346(a) (1). The periods covered were the third and fourth quarters of 1958 and the four quarters of 1959.

The plaintiff is engaged in the importation and sale of housewares and giftwares manufactured in Japan. During the periods in question plaintiff imported and sold certain germanium diode radio receiving sets (Exs. 1–4) manufactured in and imported from Japan. These sets were of three styles: a wrist radio, a rocket radio and a pocket radio.

The questions presented in this case are as follows:

(1) Were the germanium diode radio receiving sets imported and sold by plaintiff during the third and fourth quarters of 1958 radio receiving sets of the entertainment type within the meaning of Section 4141 of the 1954 Internal Revenue Code, as amended?

(2) Were the germanium radio receiving sets sold by the plaintiff in the four quarters of 1959 taxable as radio receiving sets within the meaning of Section 4141 of the 1954 Internal Revenue Code?

(3) Is the United States equitably estopped from retroactively invoking Revenue Ruling 58–333?

The case was tried to the court without a jury. After hearing the testimony of the parties, examining the exhibits, pleadings, briefs and the proposed findings of fact and conclusions of law submitted by counsel, this court makes the following Findings of Fact and Conclusions of Law, separately numbered:

1. Plaintiff is and at all times hereinafter mentioned was a corporation organized under the laws of the State of New York engaged in the importation and sale of housewares and giftwares manufactured in Japan. (3–4; Complaint, par. 2) [1]

2. During the third and fourth quarters of 1958 and the four quarters of 1959 plaintiff imported from Japan and sold certain devices which the defendant alleges are radio receiving sets and which have been described as crystal or germanium diode radio receiving sets. (9, 10)

3. These instruments, hereinafter described as germanium diode radios, were in three styles: a wrist radio, a rocket radio and a pocket radio. (Exs. 1–4)

4. The plaintiff did not include the excise tax on these devices in the price of the radio and did not collect the amount of the tax from the persons who purchased such radios. (32)

5. The following manufacturer's excise taxes were assessed on these articles for the following periods:

| | |
|---|---|
| Third Quarter 1958 | $ 727.74 |
| Fourth Quarter 1958 | 2,354.52 |
| First Quarter 1959 | 872.35 |
| Second Quarter 1959 | 768.90 |
| Third Quarter 1959 | 38.58 |
| Fourth Quarter 1959 | 111.79 |

(Complaint, para. 6; 2–3)

6. Plaintiff paid the assessments on or about February 16, 1962, together with interest in the sum of $825.59, under protest. (Complaint, paras. 6–7; 2–3)

7. On May 18, 1962, plaintiff filed in the office of the District Director of Internal Revenue a timely claim for re-

---

1. Numbers in parentheses following the Findings of Fact refer to pages in the trial transcript.

fund of each of the manufacturer's excise taxes paid on each of the aforesaid assessments, together with the interest thereon. (Complaint, para. 10; 2-3)

8. The claims of plaintiff were disallowed by the defendant and thereafter this suit was instituted. (Complaint, para. 12, admitted by Answer)

9. During the applicable period, the president of the plaintiff was David Breslow who was also in charge of selling. (4, 13, 14)

10. Mr. Breslow made several sales trips in 1958 and 1959. (15, 16) In order to make sales Mr. Breslow had to demonstrate that the germanium radios worked. (20-23, 37)

11. To aid in the sale of the germanium diode radios and to serve as an advertisement, plaintiff placed a display card into each box of a dozen rocket radios, which said "Rocket A-1, Tiny Germanium Radio" and displayed a boy riding a rocket. (26; Ex. 5)

12. There was enclosed with each germanium diode radio sold by the plaintiff an instruction leaflet. (46-47; Exs. A, B)

13. The instruction leaflet for the pocket radio (Ex. A) stated:

"POCKET RADIO
INSTRUCTIONS

SIMPLE TO OPERATE: JUST CLIP YOUR ANTENNA TO METAL AND TUNE IN YOUR STATION.

\* \* \* \* \* \*

ABSOLUTELY SAFE: BECAUSE 'POCKET' RADIO IS IN NO WAY CONNECTED TO ANY SOURCE OF POWER ELECTRICITY, IT IS COMPLETELY SAFE FOR ALL TO USE.

THE ELECTRONIC EXPLANATION OF HOW YOUR POCKET RADIO WORKS:

Actually, it is the radio broadcasting stations that supply the operating power for your 'Pocket' Radio. The frequency waves broadcasted by the stations, flow through the air, and are 'induced' into the metal structures and wires in or near your home. Then the Germanium Diode and internal Ferrite Loop, rectifies and tunes this signal energy, This rectified energy is amplified by your earpiece permitting your listening pleasure.

\* \* \* \* \* \*

\* Wonderful for everyone who wants a private, personal, compact radio! Grown-ups, teenagers, children \* \* \* everyone loves the pocket radio.

\* Perfect for private listening in bed without disturbing anyone.

\* Terrific for sporting events, music, news and your favorite program.

\* Just the thing to help bedridden patients pleasantly wile away the hours.

\* In the event of power failures, 'Pocket' Radio will permit you to stay abreast of the news and civilian defense broadcasts."

14. The instruction leaflet for the rocket radio (Ex. B) stated:

"FEATURES
Pocketable Size
No Battery & No Electricity
Semi-permanent Life
Trouble-free
No Disturbance to Others
Private Enjoyment
Hi-Fi Tone Quality
Simple Tuning (just pull out or push in the rod antenna)"

15. A similar type of instruction leaflet to that described with respect to the rocket radio was included with the wrist radio. (48-49)

16. The germanium diode radios sold by plaintiff to various distributors and stores were sold in retail stores to the consumer for prices varying from $1.29 to $2.98. (41)

17. The germanium diode radios contained the following component parts:

(a) An aerial or antenna;

(b) A tuning circuit consisting of a tuning coil and a capacitor;

(c) A detector consisting of a germanium diode;

(d) A transducer, to wit, an earpiece. (366–373; Exs. D, E and 17)

18. The germanium diode radios have a variable tuning circuit which enables the listener to select which station he wishes to hear, among those within the tuning range of the radio. (372)

19. Among the components of the germanium diode radios, the tuning coils, germanium diodes and earpieces appeared to be of low cost and quality. (Exs. 1, 2, 4, G; 298, 299–300, 304–05, 329) The quality of the capacitors and, where present, resistors was fairly good. (Exs. 3, 4; 355, 388) There is no evidence to indicate that these components were substandard for the use intended.

20. The germanium diode radios lack certain features commonly found on non-crystal commercial radios:

(1) volume control (179; Exs. D, E);

(2) amplification (182, 205–06; Exs. D, E);

(3) correct tuning calibration (163–64, 166–67, 171, 412).

On the other hand, they are light, simple, compact and do not require power supplies. (Exs. 1–4, D, E)

21. In tests performed at various locations in New York City the germanium diode radios received fairly clearly as many as five stations at a location and as few as one. (Ex. 15) They are capable of receiving a substantial part but not all the frequencies on the broadcast band. (166, 363, 371, 374, 405, 426–27; Ex. 15) In general, the radios produced a continuous stream of sound with occasional variation in volume when receiving a broadcast. (38, 85, 386)

22. Testimony as to low volume (174–76, 332) and poor tonal quality (86) was in part based on tests made under adverse conditions. Plaintiff's witness, Mr. Frankel, tested them in steel frame buildings and, contrary to instructions, did not connect an outside antenna. (Ex. B; 78–79, 129–130) It is noted that one set of instructions (Ex. A) was somewhat vague as to the circumstances when an outside antenna would be necessary.

Plaintiff's expert, Mr. Minter, tested his samples at a place 30 miles from New York City (238) and six or seven miles from a one or two kilowatt local station. (161) Several New York City stations broadcast at 50 kilowatts and others at powers of between one and fifty kilowatts. (240–41) The more powerful the station the better the reception on the radio. (243) Had he been closer to New York City or to a more powerful station it is probable that reception would have been better.

However, there was other evidence indicating that volume was sometimes weak (Ex. 15; 386) and tonal quality somewhat inferior to common commercial radios. (387)

23. The germanium diode radios display poor selectivity, which causes two stations to be heard at once when their broadcast frequencies and their signal strengths at the point of reception are close together. (99, 167–68, 169, 410–11)

24. The general operating characteristics of the germanium diode radios are somewhat inferior to other types of common conventional radios. (See Findings of Fact Nos. 21, 22, 23; 106–07, 146–47, 426; Exs. 10–13, 15) They are also a little more difficult to operate in some respects, e. g., the antenna must be clipped to something metallic. (Exs. A, B)

25. The radios were sold to toy jobbers, toy buyers of department stores and general merchandise jobbers. (15–16) The rocket radios were advertised as toys. (Exs. 5, 7, 8) The germanium diode radios were not exhibited at trade shows attended by radio dealers except as toys in a housewares show. (108–11)

## DISCUSSION

The governing statute, Section 4141, had its origin in Section 3404 of the Revenue Act of 1941. Section 3404 provided:

"TAX ON RADIO RECEIVING SETS, PHONOGRAPHS, PHONO-

GRAPH RECORDS, AND MUSICAL INSTRUMENTS.

"There shall be imposed upon the following articles (including in each case, except in the case of musical instruments, parts or accessories therefor sold on or in connection with the sale thereof) sold by the manufacturer, producer, or importer a tax equivalent to 10 per centum of the price for which sold:

"(a) Radio receiving sets, automobile radio receiving sets, combination radio and phonograph sets, and phonographs."

The tax on radio receiving sets was reenacted in Section 4141 of the Revenue Act of 1954. In 1955 this provision was amended to limit the application of the tax on receivers to those of "the entertainment type." This limitation was deleted, effective January 1, 1959, Pub. Law 85–859, Section 113(a) (1958).

█ The reason for the limitation of the excise tax in question to radios of the entertainment type was to exclude communications, navigation or detection equipment from taxation. The limitation was eliminated because of confusion engendered by it, Report of Committee on Ways & Means, Cum.Bull.1958–3, p. 3907, and a separate exemption for this type of equipment enacted, Internal Revenue Code of 1954, § 4143.

Since the germanium diode radios in question are not communications, navigation or detection equipment, there is no reason to treat them differently under the 1955 and 1959 versions of Section 4141.

Several revenue rulings have been handed down which interpret Section 4141 and its predecessor, Section 3404. The first is Rev.Rul. 167, Cum.Bull.1953–2, p. 428. There it was stated that Section 3404(a) applied to "radio kits which contain all of the necessary components for the assembly of a crystal radio receiving set, except aerial and ground wire, or for the assembly of a one tube radio receiving set, except A and B batteries and aerial and ground wires."

In Rev.Rul. 58–333, Cum.Bull.1958–1, pp. 413–14, it was said that kits "designed, advertised, and sold as toys," "made up of substandard components," capable of producing "only a semblance of audio production" and not meeting "the performance standards characteristic of a commercial radio receiving set with respect to tone and volume" were not taxable under Section 4141 of the Internal Revenue Code of 1954 as radios of the entertainment type. It was also noted that "kits comprised of components which, when assembled, are suitable for use as radios of the conventional or commercial type, and are not merely made to simulate such sets, are radio receiving sets within the meaning of section 4141 of the Code regardless of their price or quality."

In a subsequent ruling the Internal Revenue Service clarified its position with regard to crystal or germanium diode sets:

"It has come to the attention of the Internal Revenue Service that some manufacturers of radio receiving sets have misinterpreted certain language used in Revenue Ruling 58–333, C.B.1958–1,413.

\* \* \* \* \* \*

"The use of the terms 'commercial radio receiving set,' 'radios of the conventional or commercial type,' 'substandard components,' and 'toy radio receiving set kits' in Revenue Ruling 58–333 has been misinterpreted by some manufacturers to mean that the tax does not apply to simple crystal or germanium diode radio receiving sets which are designed and sold for receiving radio signals.

"A crystal or germanium diode set is considered to be a 'conventional' type of basic but actual functioning radio receiving set even though its quality may not compare favorably with the more complex sets. See Revenue Ruling 167, C.B.1953–2,428, which holds that the tax applies to kits which contain the components

for the assembly of a crystal radio receiving set or for the assembly of a one-tube radio receiving set.

"The position of the Service, as intended to be set forth in Revenue Ruling 58–333, has been to exclude from the tax toys which are incapable of receiving any radio signals.

"As a restatement of the position of the Service, it is held that the manufacturers excise tax imposed on radio receiving sets by section 4141 of the Code applies to kits containing components for radio receiving sets, including crystal or germanium diode radio receiving sets, which by reason of their design are suitable for receiving radio signals. It is immaterial whether they are basic (simple) or complex, whether they incorporate amplification stages, and whether they are intended for use by children or adults. The tax does not apply to toys which are incapable of receiving any radio signals.

"Because of the misinterpretation of Revenue Ruling 58–333 which is mentioned above, that ruling is hereby revoked."

█ The taxpayer complains that he relied on the 1958 Ruling in not collecting or paying the tax. However, even if he correctly interprets the 1958 ruling not be apply to the radios in issue here, he cannot enforce an equitable estoppel against the United States. The Internal Revenue Service is free to retroactively correct mistakes of law even though relied on by a taxpayer. Dixon v. United States, 224 F.Supp. 358 (D.C.1963), aff'd, 333 F.2d 1016 (2nd Cir. 1964), 381 U.S. 68, 85 S.Ct. 1301, 14 L.Ed.2d 223 (Sup. Ct.1965); Automobile Club of Michigan v. Commissioner of Internal Revenue, 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957).

██ The position of the Treasury Department is worthy of weight in interpreting the statute. The 1958 Revenue Ruling, although ambiguous with respect to the particular devices in issue,

was, nevertheless, far more favorable to plaintiff than the 1961 Ruling. The 1961 Ruling clearly taxes the germanium diode radios in issue. Of the two, of course, this court has no choice other than to give precedence to the 1961 Ruling, particularly since it was issued as a clarification of the earlier ruling.

█ Viewing the statute independently of any Treasury interpretation and lacking any clear Congressional intention, the court's first resort in construing the provision is to the ordinary and familiar meaning of the term "radio receiving set." Helvering v. William Flaccus Oak Leather Co., 313 U.S. 247, 61 S.Ct. 878, 85 L.Ed. 1310 (1941). In this connection, it is appropriate to consult dictionaries or other standard works. South Jersey Sand Co., 30 T.C. 360, aff'd, 267 F.2d 591 (3rd Cir. 1959); Cannon v. United States, 288 F.2d 269, 272 (2nd Cir. 1961).

Webster's New International Dictionary, G & C Merriam Co. (2d ed. 1957) says: "Receiving Sets—radio—a set of apparatus for receiving radio signals; specif., a portion of a complete receiving station which receives a radio frequency current from the antenna and converts it into an audio frequency current which is then made audible by a telephone receiver. It includes a tuner and detector and may include an amplifier." The expert called by the United States was in substantial agreement with this definition (360) and also testified that the essential components of a radio receiver were "an antenna, a tuner, a detector, and some means of transmitting it [sic] to the ear * * *." (363)

█ Plaintiff's expert apparently agree with the above definitions, although he mentioned an amplifier as an element "as a practical matter." (257) However, he also admitted that radios could be built without an amplifier. (227, 228, 229) The devices in issue here have all the elements named in the above definition, except an amplifier. However, it is clear that an amplifier is not an essential element of a radio receiver.

■ In any event, plaintiff's expert agreed that the germanium diode radios were radio receiving sets. (218–19) I conclude that they are.

■■ Although there may be some argument about this question, it is difficult to see how an operating crystal radio could be anything other than a "radio receiving set." The plaintiff's underlying contention must be that the radio has to be a "commercial" radio and not a toy to be taxable.

Exhibits 1–4 are capable of receiving and aurally reproducing broadcasts by commercial radio stations. The quality of reproduction is somewhat poorer than radios of other types. There are some compensating advantages, however, in the cheapness, compactness, lightness and simplicity of the germanium radios. Further, they operate without a power supply, e. g., battery. Most important is the fact that at least one and often several stations within a reasonable distance of the listener can be heard fairly clearly. A listener can hear the news and listen to Beatles recordings—in short, use it for the purpose he would use any other radio of that price and size class. Indeed, plaintiff was successful in selling the devices only when he could demonstrate that they worked. I believe that the fact that certain of the radios were in the form of rockets or wrist watches does not detract from their suitability for use as ordinary radios. I believe that Exhibits 1–4 are "commercial" radios, although I am not convinced that this difficult-to-define term is necessarily part of the statute. The crucial factor is that these radios are suitable for use as conventional radios. See Sackman Bros. Co. v. Hoey, 125 F.2d 490 (2nd Cir. 1942) (per curiam).

No Treasury Regulation has been issued interpreting the term "radio receiving set" in Section 4141. In contrast, the term "musical instrument" has been defined in the Regulations for purposes of the excise tax on them in Section 4151 of the Internal Revenue Code. Treas.Regs. § 48.4151–1(d). There it is said that "the term does not include articles in the nature of toys or novelties which simulate musical instruments and which are unsuitable for use in playing musical compositions or in teaching music." This Regulation was applied in Rev.Rul. 62–44, 1962–1, Cum.Bul. 209.

If an analogous interpretation was imposed on the term "radio receiving sets," and the Treasury has not done so by regulation, the radios in issue here would be taxable since they are suitable for use as conventional radios.

In conclusion, the devices in issue here which were imported and sold during the last half of 1958 and 1959 are subject to excise tax.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of this action pursuant to 28 U.S.C. § 1346(a)(1).

2. The germanium radios imported and sold by the plaintiff during the four quarters of 1959 are radio receiving sets within the meaning of Section 4141 of the 1954 Internal Revenue Code.

3. The germanium radios imported and sold by plaintiff during the third and fourth quarters of 1958 are radio receiving sets of the entertainment type, within the meaning of Section 4141 of the 1954 Code, as amended.

4. The defendant is entitled to a judgment dismissing the complaint with costs.

Settle judgment on notice.