**A. N. DERINGER, INC., Appellant,**

v.

**The UNITED STATES, Appellee.**

**Customs Appeal No. 75–13.**

United States Court of Customs and Patent Appeals.

Nov. 13, 1975..

Barnes, Richardson & Colburn, New York City, attorneys of record, for appellant; Joseph Schwartz, New York City, of counsel.

Carla A. Hills, Rex E. Lee, Asst. Attys. Gen., Andrew P. Vance, Chief, Customs Section, Wesley K. Caine, New York City, for the U. S.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

RICH, Judge.

The importer appeals from a summary judgment entered against it, on the Government's motion, by the United States Customs Court, 73 Cust.Ct. 144, C.D. 4564, 386 F.Supp. 518 (1974). The trial court held that the ".38 special caliber Smith & Wesson revolvers," imported from Canada in 1965 and 1968, were not "Products of the United States" eligible for duty-free entry under item 800.00, TSUS. We affirm.

### The Goods Imported

The pleadings and affidavits filed in connection with the Government's motion for summary judgment show that the goods were originally manufactured in the United States and known as ".38 caliber Smith & Wesson revolvers." During World War II they were exported to New Zealand under the Lend-Lease Act of 1941. After the weapons had become surplus in New Zealand, they were sold by the New Zealand government, either directly or through an intermediary, to Century Arms, Inc., appellant's principal. The arms were shipped to Canada, where they were "rechambered" to accommodate the .38 special cartridge. This rechambering deepened the chamber to accommodate the longer .38 special cartridge but did not alter the original mouth diameter of the chamber. The goods were imported in this condition. Affidavits submitted by appellant in opposition to the motion indicate that the rechambering greatly reduced the accuracy of the revolvers, permitted deformation of the cartridge case in firing which destroyed further utility of the cartridge case for reloading, and made the revolvers unsuitable for further military use. The affiants gave their opinions that the rechambering diminished the commercial value of the revolvers and put them in worse condition than before.

The record shows that Century Arms applied on several occasions to the Department of State for, and obtained, licenses to import the revolvers at bar. Each application contained the statement, "Revolvers substantially transformed in accordance with Section 121.-02(b), International Traffic of [sic, in] Arms." Importation of the revolvers was illegal under 22 U.S.C. § 1934(b) without such licenses.

### Statutes and Regulations

The Tariff Schedules of the United States provide:

Schedule 8.—SPECIAL CLASSIFICATION PROVISIONS

Part 1.—ARTICLES EXPORTED AND RETURNED

\*   \*   \*   \*   \*   \*

Item 800.00 Products of the United States when returned after having been exported, without having been advanced in value or improved in condition by any process of manufacture or other means while abroad. [duty free]

Section 414 of the Mutual Security Act of 1954, ch. 937, 68 Stat. 848, as amended by Pub.L. 85–477, 72 Stat. 267 (1958), 22 U.S.C. § 1934, provides in relevant part:

(b) As prescribed in regulations issued under this section, every person who engages in the business of manufacturing, exporting, or importing any arms, ammunition, or implements of war, including technical data relating thereto, designated by the President

under subsection (a) of this section shall register with the United States Government agency charged with the administration of this section, and, in addition, shall pay a registration fee which shall be prescribed by such regulations. Such regulations shall prohibit the return to the United States for sale in the United States * * * of any military firearms or ammunition of United States manufacture furnished to foreign governments by the United States under this chapter or any other foreign assistance program of the United States, whether or not advanced in value or improved in condition in a foreign country. *This prohibition shall not extend to similar firearms that have been so substantially transformed as to become, in effect, articles of foreign manufacture.* [Emphasis ours.]

The State Department, charged with administering the import licensing program under 22 U.S.C. § 1934(b) at the times the revolvers were imported,[1] issued regulations which repeat in substantially the same language the requirements of the statute for the granting of import licenses on shipments of Lend-Lease weapons.

22 CFR 123.03(c) (1968) states that the restriction on importation of weapons imposed by the statute

> * * * covers firearms which are advanced in value or improved in condition in a foreign country, but it does not include those which have been so substantially transformed as to become, in effect, articles of foreign manufacture (see § 121.02).

22 CFR 121.02 (1968) states in material part:

> As used in § 123.03(c), the term "substantially transformed" shall refer to the realteration of firearms abroad to accomplish the following changes:
>
> *    *    *    *    *    *

(b) As applied to pistols and revolvers, the changes must have included at least either (1) rechambering or (2) modification of the cylinder for the accommodation of a higher caliber or charge cartridge.

The 1965 regulations do not differ from the 1968 regulations in any material respect.

### Customs Court Opinion

The Customs Court found that the revolvers, having been "substantially transformed" by the rechambering in Canada, were no longer "Products of the United States" within the meaning of item 800.00, TSUS, and dismissed the action:

> In the instant case the uncontroverted evidence presented on the motion discloses that the changes made in Canada on revolvers of unquestioned American manufacture converted them to new and different uses. After the rechambering operation the revolvers were no longer capable of firing with accuracy the .38 caliber bullets which they had been originally designed to fire. Rechambering suited these revolvers to accept and fire the .38 caliber special bullets—bullets with different dimensions and capacities.[2] And this change necessitated a different nomenclature for these revolvers, i. e., .38 special caliber rather than .38 caliber. It follows, therefore, that the imported revolvers, under the principle of [*United States v. Tower & Sons*, 9 Ct.Cust.Appls. 135, T.D. 37981 (1919)], must be considered to be products of Canada rather than of the United States.
>
> Section 1934(b) and the State Department regulations promulgated thereunder, speaking in terms of substantial transformation as rendering weapons in effect articles of foreign manufacture, affords the court an ad-

---

1. Exec. Order No. 11432, 3 CFR 481 (1968), transferred control of munitions under § 1934(b) from the State Department to the Treasury Department after the times of importation here.

2. The court is here evidently using the term "bullet" to mean cartridge which is a bullet attached to a powder-containing casing.

ditional basis for reaching the same conclusion regarding loss of identity as to the imported revolvers.

In view of this holding, the court deemed it unnecessary to consider whether the revolvers had been advanced in value or improved in condition by the rechambering, an alleged issue of fact that plaintiff said required a trial.

## OPINION

■ We assume, arguendo, appellant could have proved at a trial that the revolvers had not been advanced in value or improved in condition by the rechambering in Canada. This state of facts, however, would not affect the outcome since we conclude, as did the Customs Court, that the revolvers are not "Products of the United States" as a matter of law.

■ It is not disputed that the revolvers were rechambered in Canada and that rechambering constitutes "substantial transformation" under 22 CFR 121.-02(b). Since appellant did not challenge below the validity of the regulation, which construes the term "substantial transformation" in 22 U.S.C. § 1934(b), rechambering must be deemed "substantial transformation" under the statute as well. It cannot be denied that appellant was granted permission to import the revolvers because of the representations of its principal to the State Department that the revolvers had been substantially transformed within the meaning of the regulations on International Traffic in Arms, 22 CFR 121.01 et seq., i. e., "so substantially transformed as to become, in effect, articles of foreign manufacture," and appellant so concedes.

Appellant argues in essence that the Customs Court erred in applying the principles of the *Tower* case, supra, to the facts of this case and that 22 U.S.C. § 1934(b), a statute concerned with allegedly different objectives than those contemplated by the Tariff Schedules and the case law construing them, should not control the tariff treatment of the revolvers. Appellant cites *United States*

*v. Mercantil Distribuidora, S.A.,* 43 CCPA 111, C.A.D. 617 (1956), and *Merck & Co. v. United States,* 24 Treas.Dec. 824, T.D. 33463, G.A. 7464 (1913), as support for its contention that the State Department regulations do not control actions under the Tariff Schedules.

The legislative history of the Mutual Security Act of 1958, Pub.L. 85–477, shows that Congress considered the impact of arms traffic on international trade in amending 22 U.S.C. § 1934(b) to include the phrase "so substantially transformed as to become, in effect, an article of foreign manufacture." S.Rep. No. 1627, 85th Cong., 2d Sess., May 26, 1958, on the 1958 amendments, states under the heading "What the Bill Does":

6. The bill prohibits the return to the United States for commercial sale of American-made military firearms (sec. 8(m)).

*2 U.S.Code Cong. & Admin.News,* 85th Cong., 2d Sess., p. 2756 (1958). The report continues, *id.* at pp. 2776–77:

### J. ARMS IMPORT CONTROL (SEC. 8(m))

The committee gave considerable attention to the problem caused by the reimportation into the United States of American firearms which are exported and then become surplus overseas. Section 414 of the act authorizes the President, "in furtherance of world peace and the security and foreign policy of the United States," to control the export and import of arms, ammunition, and implements of war. The House bill contained an amendment to this section prohibiting the return to the United States (except for the Armed Forces) of arms or ammunition furnished to foreign governments under a United States assistance program.

There is a serious question as to whether this amendment would put the United States in violation of the General Agreement on Tariffs and Trade. Further, the amendment raises administrative problems of great complexity, because it would include

arms produced abroad under the offshore procurement program. There would be no practical way of distinguishing a rifle produced under an offshore procurement contract from a rifle of the same type produced under some other arrangement.

The committee therefore agreed to a provision which would apply only to arms of United States manufacture and would—

> prohibit the return to the United States for sale in the United States (other than for the Armed Forces of the United States and its allies) of any military firearms of United States manufacture, whether or not advanced in value or improved in condition in a foreign country. This prohibition shall not extend to similar arms that have been so substantially transformed as to become, in effect, articles of foreign manufacture.

\* \* \* \* \* \*

The committee amendment will prevent the commercial importation into the United States, for civilian sale, of American rifles which may become surplus abroad. It will not affect the import of foreign-made rifles. Section 414 now provides ample authority to control these imports insofar as they involve world peace and security and United States foreign policy. Insofar as they involve foreign competition with a domestic industry, administrative remedies are open to the industry under the Reciprocal Trade Act.

This is clear indication to us that Congress intended the Mutual Security Act of 1958 amendments to be construed consistently with other provisions respecting international trade and its impact on domestic industry, of which the Tariff Schedules are unquestionably a part. Both statutes pertain to importation of goods, 22 U.S.C. § 1934(b) being directed to whether certain goods may be imported legally and item 800.00 being directed to whether goods may be imported free of duty. Although we do not go so far as to hold the statutes to be *in pari materia* in the usual sense, see 2A C. Sands, *Statutes and Statutory Construction* § 51.03 (1973), we consider it a perversion of language to construe the statutes so as to create a conflict. Appellant has presented nothing to support its premise that the objectives of 22 U.S.C. § 1934(b) and item 800.00 are different, and the evidence of congressional intent is otherwise.

Appellant does point to differences in language between § 1934(b) and item 800.00: § 1934(b) applies "*whether or not* advanced in value or improved in condition" (emphasis ours); item 800.00 concerns only goods imported "*without* having been advanced in value or improved in condition" (emphasis ours). This difference is quite understandable, since advancement in value or improvement in condition abroad is not material under *either* statute if the goods are not "products" or "articles of manufacture" of the United States. There is no distinction in meaning in this context between the terms "product" and "article of manufacture", used interchangeably in paragraph 1615 of the Tariff Act of 1930, one of the predecessor paragraphs to item 800.00.[3]

Neither of the cases cited by appellant diminishes our conviction that § 1934(b) and item 800.00 should be read to give "article of manufacture" and "product" the same legal significance. *Mercantil Distribuidora* was a three-to-two decision of the court, with one judge concurring in the result without opinion. Such a decision is of minimal precedential value outside of its specific facts, which are not analogous to the present situation. We do, however, agree with the statement in the plurality opinion, 43 CCPA at 116, that:

> (1960), "an effort has been made to improve the language without significant changes of substance [from prior provisions]."

---

**3.** It is, of course, true that item 800.00 was not enacted until 1962. However, as indicated in *Tariff Classification Study*, Schedule 8, at 12

Unless the tariff term should be shown to have been drafted with reference to the regulation, this court cannot avoid its duty of inquiring into the meaning intended for tariff purposes, which may or may not have been the same as that of the regulation.

As indicated above, we consider that the tariff term "product of the United States," *as applied to the goods at bar*, must be construed to exclude weapons subject to § 1934(b) which have been "substantially transformed" so as to be legally importable into the United States. The Tariff Schedules cannot be construed in a vacuum, and cannot be construed to defeat other policies established by Congress. We will not ascribe to Congress an intent to permit appellant to import these revolvers as foreign-made and then to steal a march on domestic arms manufacturers by importing the revolvers duty free on the theory they are products of the United States, thus destroying the protective effect of item 730.19, under which the revolvers were classified and which appellant concedes is the proper classification if the revolvers are not free of duty under item 800.00. In the *Merck* case it was clear that identity standards for coffee established by the Secretary of Agriculture pertained to prevention of adulteration of coffee offered for sale and did not purport to provide that the goods in question were not "coffee" within the common meaning used in the tariff classification provision.

We appreciate the *factual* differences between the present case and *Tower & Sons*, cited by the Customs Court for its statement of certain principles. However, the evident lack of parallelism on the facts is not sufficient to show error on the part of the court below on the facts of this case as related to the *other* statutes and regulations relevant to the classification of the revolvers. In short, *Tower & Sons* is not controlling on the facts here and was not cited for that purpose by the Customs Court.

 We conclude that weapons subject to the import restrictions of 22 U.S.C. § 1934(b) which gain entry to the United States by virtue of their having been "so substantially transformed as to become, in effect, articles of foreign manufacture" are not, as a matter of law, "Products of the United States" within item 800.00, TSUS.

The judgment of the Customs Court is *affirmed*.