AUDIOVOX CORP., PLAINTIFF *v.* UNITED STATES, DEFENDANT

Court No. 78-9-01645

(Decided January 27, 1981)

*Mandel & Grunfeld*, Esqs. (*Steven P. Florsheim* and *Robert B. Silverman*, Esqs. of counsel) for the plaintiff.

*Thomas S. Martin*, Acting Assistant Attorney General; *Joseph I. Liebman*, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch (*Madeline B. Kuflik*, trial attorney) for the defendant.

NEWMAN, Judge: In this action, plaintiff contests the classification by Customs at the Port of New York of certain merchandise imported from Taiwan during the years 1977 and 1978 described on the commercial invoices as "FM Micro-Converter Radio, Model No. FMC–1C, Audiovox Brand." Customs classified the imports (excepting those in entry No. 519854) as solid-state (tubeless) radio receivers designed for motor-vehicle installation, and assessed duty at the rate of 10.4 per centum ad valorem, as specified in item 685.21 of the Tariff Schedules of the United States (TSUS). In entry No. 519854, Customs classified the merchandise under item 685.24, TSUS, which provides for the same rate of duty on solid-state (tubeless) radio receivers other than those designed for motor-vehicle installation. However, defendant has abandoned its classification under item 685.24, and contends that the merchandise in entry No. 519854 is likewise properly dutiable under item 685.21, TSUS.

Plaintiff claims that the subject merchandise is properly dutiable as radiobroadcasting reception apparatus other than radio receivers at the rate of 6 per centum ad valorem, either under item 685.25, TSUS, as modified by T.D. 68–9 (respecting the merchandise entered in 1977), or item 685.29, TSUS, as modified (respecting the merchandise entered in 1978).[1] Alternatively, plaintiff claims that the merchandise is properly dutiable at the rate of 5.5 per centum ad valorem under the provision in item 688.40, TSUS, as modified, for electrical articles and electrical parts of articles, not specially provided for.

[1] Plaintiff incorrectly believes that item 685.29, TSUS, is applicable to the 1978 entries of merchandise, which occurred in February 1978. However, item 685.29, TSUS, applies only to merchandise entered on or after April 11, 1978. See Presidential Proclamation 4561 of Apr. 7, 1978, 43 F.R. 15127 (1978).

## ISSUE PRESENTED

Plaintiff concedes that the imports are solid-state (tubeless) devices designed for motor-vehicle installation. (R. 4). The basic dispute is whether the FM converters are classifiable as "radio receivers".

## FINDINGS OF FACT [2]

After hearing the testimony of the witnesses, examining the exhibits, and considering the briefs of counsel for the respective parties, the court makes the following findings of fact, separately numbered:

1. The imported FM converters are solid-state (tubeless) devices designed for motor-vehicle installation.

2. After installation of the converter in an automobile equipped with an AM radio receiver, the FM converter permits the user to listen to FM broadcasts on the AM radio receiver. The sole function of the FM converter is to receive FM radio waves and to convert them into AM radio band signals. Thus, the audio information that was broadcast on an FM station is presented in an AM format so that it can be played through an AM radio. To perform its function, the converter first receives the FM waves, decodes the audio information on them and then encodes them on an AM signal or frequency. Hence, the FM converter allows the user to adapt his AM car radio receiver to receive FM transmission.

3. To function properly, the converter must be connected between the automobile antenna and the antenna receptacle of the AM radio receiver. An FM converter is installed in an automobile by disconnecting the antenna cable from the AM radio, plugging the cable into the receptacle on the back of the converter, and connecting a similar cable at the back of the converter to the antenna receptacle cn the AM radio. The power lead wire at the back of the converter is then attached to any available 12-volt electrical terminal, and the unit is mounted in a convenient location with the bracket provided.

4. AM radio reception is obtained by operating the AM radio in its usual manner. The FM converter is off at this time. To obtain FM reception, the AM radio must be tuned to 1400 kilohertz (kHz) and the FM converter turned on. FM stations are selected by the tuning knob on the FM converter, but volume must be controlled by the volume knob on the AM radio.

5. The FM converter has a tuner and 1400 kHz oscillator, but does not have an audio amplifier, transducer or volume control.

---

[2] The record in this case consists of the testimony of six witnesses (five for plaintiff and one for defendant) and eight exhibits (five for plaintiff and three for defendant). The official papers were received in evidence as an unmarked exhibit.

6. An audio amplifier is a device which takes the minute level of the audio signal product coming out of the detector stage (which corresponds to the original signal transmitted) and amplifies it or increases its strength to a suitable level where it is capable of driving a sound reproducing transducer, such as a speaker, headphone or earphone.

7. The term "transducer" refers to a device that changes one form of energy into another. With respect to radio receivers, the usual function of a transducer is to change an electrical signal into an acoustic or sound signal. This function is usually accomplished through speakers or headphones.

8. The production of sound is not a necessary requirement for a radio receiver. Although the transducer is the element which converts the audio electrical signal to audible sound, the transducer is not a necessary component of a radio receiver per se.

9. The output of an FM converter is not an audio signal, but is an AM (amplitude modified), RF (radio frequency) signal at approximately 1400 kHz.

10. An FM converter has a tuner which picks up radio frequency signals, amplifies the radio frequency signals, produces an intermediate frequency (IF) signal, and detects the audio information which has been modulated or encoded onto the incoming radio signal. The minute audio signal obtained from the tuner in the FM converter is then modulated onto a constant or fixed 1400 kHz carrier radio frequency signal produced by a fixed oscillator.

11. The 1400 kHz oscillator converts the audio signal into a signal which may be used by the AM receiver in the car.

12. The sound of an FM broadcast may be obtained from the tuner portion of the FM converter. At the trial, defendant's expert witness demonstrated that a radio broadcast on the FM converter may be heard by attaching a crystal earphone inside the unit to the output of the detector in the tuner portion of the converter. Defendant's witness was able to demonstrate some minimal sound production through a similarly attached loudspeaker.

13. The imports are referred to in the electronics trade as FM converters and not as radio receivers.

PARTIES' CONTENTIONS

Plaintiff maintains that since the FM converters do not have an audio amplifier and sound control, they do not fall within the common meaning of the term "radio receiver;" that the converters are properly classifiable as radiobroadcasting reception apparatus other than radio receivers inasmuch as they presumptively perform a broadcasting

receiving function; and alternatively, that since the fixed 1400 kHz oscillator performs a second significant function, the imports are more than radio receivers or reception apparatus, and therefore are classifiable as electrical articles, not specially provided for.

Defendant contends that the FM converters fall within the common meaning of the term "radio receiver" since they are devices that convert radio waves into perceptible signals; and that lexicographic authorities do not require that a radio receiver have a separate audio amplifier or audio output. Alternatively, defendant asserts that if a radio receiver requires an audio amplifier, the imports are classifiable as unfinished radio receivers pursuant to General Interpretative Rule 10(h), TSUS.

### CONCLUSIONS OF LAW AND DISCUSSION

Central to the issue presented is the common meaning of the term "radio receiver." Common meaning is always a matter of judicial knowledge, but courts may and do, consult dictionaries, lexicons, and other reliable sources of information as an aid to their knowledge. Further, in determining common meaning, the court may properly consider the testimony of witnesses, but such testimony is not binding and may be accepted or rejected as appears proper. See Sturm, Customs Law and Administration (1980), pp. 454–56, and cases cited.

The following lexicographic definitions of radio receiver have been called to the court's attention:

McGraw-Hill Dictionary of Scientific and Technical Terms (1974): "Radio receiver—A radio receiver is a device that converts radio waves into intelligible sound or other perceptible signals."

IEEE Standard Dictionary of Electrical and Electronics Terms (1972): "Radio receiver—A radio receiver is a device for converting radio frequency power into perceptible signals."

Cooke & Markus, Electronics & Nucleonics Dictionary (McGraw-Hill 1960): "Radio receiver—A receiver that converts radio waves into intelligible sounds or other perceptible signals. Also called radio, radio set, and receiver set."

Both parties rely upon the foregoing definitions, but sharply disagree as to whether the imports convert radio waves into perceptible signals. But in my view, it is unnecessary to resolve the highly esoteric question of what constitutes a perceptible signal for purposes of the above technical definitions. Fundamentally, in the absence of contrary legislative intent, tariff terms are not to be construed in accordance with a technical or scientific meaning where that meaning differs from the common or commercial meaning. See Sturm, supra, at 453. and cases cited. Moreover, "it is to be kept in mind that in a

tariff statute Congress ordinarily employs terms in their commercial sense". *Esco Manufacturing Co., aka J. Hofert Co.* v. *United States,* 63 CCPA 71, 73, C.A.D. 1167, 530 F. 2d 949 (1976). See also *Ameliotex, Inc.* v. *United States,* 65 CCPA 22, C.A.D. 1200, 565 F. 2d 674 (1977).

Respecting the meaning of "radio receiver" as that term is used in the electronics trade, the court finds the testimony of plaintiff's five witnesses definitely more persuasive than the testimony of defendant's sole witness. Plaintiff's witnesses had long commercial experience in the consumer electronics industry and a thorough familiarity with the design and trade terminology related to radio receivers and FM converters. Defendant's sole witness, on the other hand, was a professor of electrical engineering and electrophysics at the Polytechnic Institute of New York, and as primarily a scientist and experimental analyst, had relatively limited trade experience.

The record in this case establishes by a clear preponderance of the evidence that a "radio receiver," as that term is commonly used in the electronics industry, consists of at least a tuner plus an audio amplifier.[3] *Cf. Symphonic Electronics Corp.* v. *United States,* 72 Cust. Ct. 211, C.D. 4543 (1974); *Symphonic Electronics Corp.* v. *United States,* 77 Cust. Ct. 147, C.R.D. 76–5 (1976). See also the schematic block diagrams in the "Encyclopaedia Britannica," 1970 edition, volume 18, pages 1092–93, which lend support to the testimony of plaintiff's witnesses.[4] The FM converters have a tuning section and a 1400 kHz fixed oscillator, but lack an audio amplifier. Defendant's demonstration at the trial (through its expert witness), that FM reception could be heard on the converter without an audio amplifier by tapping into the detector stage of the tuner portion of the converter with a crystal earphone, is not demonstrative that an FM converter is classifiable as a "radio receiver" as that term is commonly understood in the electronics trade. While defendant's demonstration proves that the function of the converters' 1400 kHz oscillator could be bypassed and the use of the AM radio eliminated, obviously the imports were not designed nor intended to be used in such contrived manner. Furthermore, the court may take judicial notice of the fact that headsets are not normally used as transducers in automobile radios, and that it would be quite unusual for a radio listener to attach a transducer to the output of the detector stage of an automobile radio receiver. Moreover, it is evident that the lack of any means of con-

---

[3] A low fidelity radio receiver (e.g. a table radio) for home entertainment normally includes, in addition to a tuner and audio amplifier, a speaker within its cabinet.

[4] It is interesting to note that the first radio receiver, demonstrated by Heinrich Hertz in Germany in 1887, consisted simply of an open wire loop with spheres attached to the ends to form a gap. The presence of radio waves was detected by observing a spark set up on the sphere gap. However, the Hertz device had no practical application. See "Encyclopaedia Britannica," 1970 ed., vol. 18, p. 1090.

trolling the volume of the sound would make any radio reception device commercially impracticable for use as a radio receiver in an automobile.

Unlike conventional radio receivers designed for automobile installation on which sound may be heard when connected to a speaker, FM converters in normal use are not capable of producing sound upon attachment to a speaker since the converter does not produce an audio signal as its end product. Rather, the end product of an FM converter is an AM radio frequency signal modulated by FM audio information. Such signal must be processed by the automotive AM radio—like any other AM signal—before an audible signal (sound) is produced. The short of the matter is the imports do not function as conventional radio receivers. The sole function of the FM converter is to receive and then convert FM radio signals into AM radio wave signals. Plainly, conventional radio receivers do not perform such FM to AM signal conversion function.

Notwithstanding that the subject imports were invoiced and described on their packaging as "FM Microconverter Radio," the record establishes that the converters are bought, sold, and referred to in the electronics trade as "FM converters" or "converters," and not as "radio receivers" or as "radios." Significantly, plaintiff's promotional literature (collective exhibit 5) shows that the terminology used by plaintiff in advertising and marketing the subject merchandise is FM converter (R. 175–180). And the fact that the imports bear a label showing compliance with the rules and regulations of the Federal Communications Commission pertaining to radio receivers (47 CFR part 15, subpart C) is not controlling as to their tariff classification. *Cf A. N. Deringer, Inc.* v. *United States*, 63 CCPA 37, 42, C.A.D. 1161, 524 F. 2d 1215 (1975). In any event, the instructions for completing FCC form 740, attached to the official entry papers, in enumerating the typical examples which require the use of the form, make a distinction between radio and TV receivers and converters.

In support of its contention that a "radio receiver" within the common meaning of that term is not required to have an audio amplifier or volume control (as claimed by plaintiff), defendant cites *Davar Products, Inc.* v. *United States*, 245 F. Supp. 460 (S.D.N.Y. 1965). There, the district court held that certain crystal or germanium diode radio receiving sets, which included a transducer and were suitable for use as conventional radios, were subject to the excise tax on radio receiving sets under section 4141 of the Internal Revenue Code of 1954, as amended. The district court found that although the germanium diode radios lacked certain features commonly found on noncrystal commercial radios, i.e., volume control, amplifier and correct tuning calibration, the radios in question were "capable of receiving and

*aurally reproducing* broadcasts by commercial radio stations" (italic added) and were suitable for use as conventional radios, which was held to be the crucial factor.

Unlike the *Davar* radios, the subject FM converters are not capable of aurally reproducing broadcasts by commercial radio stations (except through an AM radio), and are not suitable for use as conventional radios. Consequently, *Davar* does not support the Government's position in the present case, but instead, tends to support plaintiff's argument.

Defendant's argument that the imports are classifiable under item 685.21, TSUS, as unfinished radio receivers by virtue of General Interpretative Rule 10(h),[5] is without merit. While amplification is performed by the audio amplifier of the car's AM radio, the latter is not a missing part of the converter. For purposes of converting FM to AM radio signals, the converters are imported and sold as complete units and require no finishing by the addition of an audio amplifier or sound control. Stated differently, the FM converters do not become finished radio receivers by connection to the automobile's AM radio, but in essence the converters are a complete radio accessory which permits the reception of FM broadcasts on the AM car radio.

In summary, inasmuch as the FM converters do not have an audio amplifier and volume control, nor in performing FM to AM signal conversion do they function as conventional radio receivers; and since they are not known as, or referred to, in the electronics industry as radio receivers, the impo. "s are not within the common or commercial understanding of that term. Hence, plaintiff has overcome the presumption of correctness attaching to the classification of the Customs Service under item 685.21, TSUS.

We now turn to plaintiff's primary claim under item 685.25, TSUS, and its alternative claim under item 688.40, TSUS.

Although plaintiff has overcome the presumption that the imports are radio receivers, the presumption arising out of the classification under the superior heading to item 685.21 that they are radiobroadcasting reception apparatus stands intact. *United States* v. *New York Merchandise Co.*, 58 CCPA 53, C.A.D. 1004, 435 F. 2d 1315 (1970). Consequently, plaintiff's primary claim under item 685.25, TSUS is sustained.

Plaintiff has not established its alternative claim that the imports are more than radiobroadcasting reception apparatus by reason of their 1400 KHz fixed oscillator. Indeed, plaintiff's witness Eric Sky testified that the FM converter is a reception apparatus (R. 57) and

---

[5] This rule reads:
(h) unless the context requires otherwise, a tariff description for an article covers such article, whether assembled or not assembled, and whether finished or not finished;

that the fixed oscillator is part of the reception device (R. 66). Therefore, plaintiff's attempt to transform conversion into a second significant function of the imported article separate and distinct from reception is unsupported by the record.

On the law and the facts, the court concludes:

Plaintiff has established that the subject merchandise was erroneously classified by Customs under item 685.21, TSUS, and has sustained its primary claim that the merchandise is properly dutiable under item 685.25, TSUS;

Plaintiff's alternative claim under item 688.40, TSUS, is dismissed.

Judgment will be entered accordingly.